

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00213-CV

IN THE INTEREST OF
D.R.T., JR., L.B.T., AND
N.C.P., II

------------

FROM THE 362ND DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. Introduction

In three issues, Appellant Mother appeals the termination of her parental rights to D.R.T. Jr., L.B.T., and N.C.P. II. We affirm.

---

[1]See Tex. R. App. P. 47.4.

## II. Factual and Procedural Background

Mother and D.R.T. Sr. (David)[2] had two children together: D.R.T. Jr., born in January 2003, and L.B.T., born in February 2005. Mother and N.C.P. Sr. (Nathan) also had two children together: N.C.P. II, born in December 2008, and A.N.P., who was born during the pendency of this case and who is not the subject of this appeal.[3]

## A. Events Prior to and During 2007

Mother and David met when they both worked for IBM. After they married and had D.R.T. Jr. and L.B.T., David stayed at home and took care of the children while Mother worked.

Between March and May 2007, Mother and David separated, and Mother left IBM after having worked there for around thirteen years.[4] In December 2007, Mother became involved with Nathan, who had a history of incarceration and

---

[2]To protect the identities of the children, we identify the children by initials and the children's family members using pseudonyms. *See* Tex. Fam. Code Ann. § 109.002(d) (West 2008 & Supp. 2011).

[3]Tarrant County Child Protective Services (CPS) opened a case for A.N.P. in January 2011.

[4]Mother said that she left her job because it was "changing in a direction that [she] didn't really care for," and because she wanted to spend time with her children as a stay-at-home mom.

drug use,[5] upon his release from state jail for an unauthorized use of a motor vehicle conviction.

Within two or three days of their meeting, Nathan moved into the White Settlement house where Mother, her father Tom, one of her brothers, D.R.T. Jr., and L.B.T. lived, which was across the street from Mother's brother Drake and his wife Tamara's house.

## B. Events during 2008

Mother divorced David in 2008 after around sixteen years of marriage. The divorce decree named Mother and David as joint managing conservators of D.R.T. Jr. and L.B.T. but gave Mother the right to designate the children's primary residence. David said that he had consented to Mother being the children's primary caregiver because at the time, he was unemployed, living with his mother, and "trying to get back on [his] feet" after having been a stay-at-home father. David admitted that immediately after they separated, he was depressed that he would no longer get to "be there 24/7" for his children and had attempted suicide but said that he had not done or thought about doing anything like that since that time.

Mother used money from her IBM pension to buy a truck, which she put in her name and Nathan's name. In February 2008, three months after Nathan met

---

[5]Nathan was convicted of possession of a controlled substance of less than one gram in 2006, which he said was the last time that he used methamphetamine. When asked if he recalled how many times he had been arrested, Nathan said, "I can't count that high."

Mother, police arrested him after stopping him for driving over 120 miles per hour. Mother was in the front passenger seat, and Tom, D.R.T. Jr., and L.B.T. were in the back seat. Nathan's blood test results showed a .12 blood alcohol concentration. *See* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011) (defining "intoxicated" to mean having an alcohol concentration of 0.08 or more). Nathan was charged with driving while intoxicated (DWI) with a child passenger.

Tamara, Mother's sister-in-law, said that after Mother and Nathan started living together, Mother told her that the holes in the wall at Mother's White Settlement house were caused by Nathan. Mother told her brother Drake that when Nathan got mad when they argued, he would "just kind of hit the walls." When asked if he knew how many times Nathan got mad and hit the walls, Drake said, "More often than I can count." Nathan denied punching holes in the walls of places he had lived with Mother and the children.

Mother sometimes called Drake when she needed help with Nathan. Drake said he had received several calls from Mother when Nathan had left her stranded after physically pushing her out of their vehicle and leaving her on the side of the road. Nathan testified that the first time he stranded Mother was in 2008, while she was pregnant with N.C.P. II. Mother said that Nathan had taken the truck and stranded her so many times that she had lost track, explaining, "[h]e gets mad; he leaves."

In the summer of 2008, Mother, Nathan, D.R.T. Jr., and L.B.T. moved from the White Settlement house to an apartment in Roanoke. Nathan said that after

4

they were asked to leave the apartment complex because he was a felon, they moved to Ranger. Tamara said that because Mother did not have a job or any way to support herself,[6] she and Drake had asked Mother and the children to stay with them, with the stipulation that Mother could not be with Nathan. Tamara also said that she was not comfortable with Nathan taking care of D.R.T. Jr. and L.B.T. because she felt that Nathan had a temper and she was afraid of what he might do to them. Tamara said that she and Drake had two boys and that she never allowed Nathan to care for them.

Nathan was arrested in September 2008 for committing another DWI, and Mother, D.R.T. Jr., and L.B.T. stayed in Ranger until November 2008, living with Mother's younger brother Jason, Jason's wife Patty, and Jason and Patty's three kids in a three-bedroom house owned by Patty's family. After his September 2008 arrest, Nathan remained in jail and pleaded guilty to the earlier DWI-with-a-child-passenger charge in exchange for fifteen months' confinement. Nathan said that Mother brought the children to jail to visit him every weekend except for the weekend in April 2009 when she was arrested.

In November 2008, Mother, D.R.T. Jr., and L.B.T. moved in with Mother's mother Jane and Jane's boyfriend Carl. Nathan was not released from jail until after N.C.P. II's birth in December 2008.

---

[6]Mother collected unemployment insurance benefits upon leaving IBM.

5

## C. Events during 2009

Mother, D.R.T. Jr., L.B.T., and N.C.P. II remained with Jane and Carl until April 2009, and then Mother rented a two-bedroom house in nearby Sansom Park, where she moved with the three children, Nathan, her father Tom, Jason, and Jason's family. Tamara saw holes in the wall at the Sansom Park house like the ones Nathan had made before, and she and Drake told Mother that they would be happy to help her find a job and daycare so that "she wouldn't think she had to be with [Nathan]."

In October 2009, Mother started using the Internet to look for work. In December 2009, Nathan tried to provoke a fight with David when he accompanied Mother to pick up D.R.T. Jr. and L.B.T. from David. On another occasion, Nathan threatened to kill David.

## D. Events during 2010

Mother said that the first time Nathan had abused her was in March 2010 but that she only sustained a scratch and not a "bleeding injury." She attributed the abuse to their changed financial circumstances.

Mother said that a disagreement at a friend's house in Alvarado led to the altercation, although she did not remember the details. Nathan stranded her, and when he returned, she refused to go with him. Mother said that she had blacked out that night but denied that either she or Nathan had been drinking much.

Not long afterwards, Nathan drove off one night with N.C.P. II in the vehicle. Mother said that she called the police out of concern but that Nathan returned before noon the next day, March 14, and N.C.P. II was fine.

Sansom Park Police Officer Aaron Callahan testified that when he responded to the domestic disturbance call at Mother's residence at around 3:00 p.m. on March 14, Nathan had already left the scene. Mother told Officer Callahan that she and Nathan had had a disagreement about Nathan leaving, so she climbed into the vehicle with him and he pulled her out several times.[7] Mother showed Officer Callahan the scratch to her underarm that she sustained during the altercation with Nathan. Officer Callahan said that Mother also had some redness and light bruising on the left side of her face, but when he asked Mother about it, she told him that it had happened a few days before and that she had reported it.[8]

Tamara said that around 2010, she saw bruises on Mother's cheek and the palm of Mother's hand and scratches on Mother's arms. Mother told her that she and Nathan had been in an argument, that she sustained the scratches when he

---

[7]Mother testified that she did not recall Nathan pulling her from the truck when she tried to keep him from leaving.

[8]Contact notes by a Family Based Social Services (FBSS) worker about the encounter indicate that Mother denied that a golf ball-sized bruise on her arm and her scraped knees were injuries sustained when Nathan pulled her out of the vehicle by her arm, that Mother did not have an explanation for a bruise on her left cheek, and that Mother denied that Nathan had ever punched or slapped her, although she admitted that he had grabbed and pushed her.

pulled her from their truck, and that she sustained the bruise on her hand when she fell. Mother did not acknowledge the bruise on her cheek.

Mother said that the second time she experienced domestic violence with Nathan occurred a few days later, in the parking lot of a bar in Fort Worth. Daniel Martinez, who had been a Sansom Park police officer at the time of the March 17 incident, testified that he was dispatched to the scene around 1:35 a.m. Nathan had already left when he arrived.

Martinez said that he smelled a strong odor of alcoholic beverage on Mother, that her eyes were red and glassy, that she had slurred speech, and that she had told him that she had been drinking. Mother told him that she and Nathan had argued, that he had slammed her down on the concrete, and that when she hit her head on the ground, she lost consciousness. When she regained consciousness, Nathan was taking items like her credit cards, car keys, and cell phone out of her pockets. Mother was on the ground behind their vehicle, so when Nathan put the vehicle in reverse and tried to back up, he almost ran over her. Martinez said that Mother had numerous injuries to the left side of her face, that her hands and knees were scraped up, and that one of her hands appeared swollen and possibly broken.

When Mother told Martinez that she was pregnant, Martinez verbally reprimanded her for drinking alcohol; Mother shrugged off the reprimand, stating, "[Y]eah, I know I shouldn't be doing it but—you know." Martinez testified that he did not leave Mother at the bar, stating,

8

Well, number one, she was intoxicated, so I—you know, she was a danger to herself. I didn't want to leave her there. You know, it was 1:30 in the morning, it's a rough part of town, and she was pregnant, like she told me. So I offered to give her a ride home, since she lived inside of our city, which I did. I gave her a courtesy transport home.

Martinez also gave Mother what he referred to as "the required standard domestic violence literature," which contained numbers for battered women's shelters and information on getting an emergency protective order. Nathan was not home when they arrived at Mother's house, and Martinez advised her that if she felt threatened or if Nathan came back, she should call 9-1-1 immediately.

In contrast to Martinez's testimony, Mother said that she had had one beer that night and that she had learned that she was pregnant with A.N.P. later that weekend. Mother said that she fell in the gravel parking lot and hit some rocks, which scraped her knees and caused the left side of her face and her hand to swell.[9] When asked if Nathan nearly ran her over as he backed the vehicle up while she was still on the ground, Mother said, "I believe at one point there was some closeness that—yeah."

CPS investigative supervisor George Lindner testified that CPS had received an allegation of physical abuse, neglectful supervision related to

---

[9]Contact notes by an FBSS worker indicate that Nathan said that he and Mother "got into it" at the bar after they had each had a couple of drinks and that Mother was "trying to take off without [him]" so he pulled her out of the truck and took off before the police came. Nathan told the FBSS worker that he had never punched or slapped Mother and that he primarily would grab her to prevent her from hitting him "when she goes ape shit." Nathan testified that he did not recall this conversation.

9

domestic violence in the home, and possible drug use with regard to Mother and Nathan, and he explained that children could be physically or emotionally harmed by domestic violence. Lindner said that CPS made a "reason to believe" finding with regard to domestic violence after a CPS worker spoke with Mother, Nathan, and the children and that the Department of Family and Protective Services (DFPS) opened an FBSS case, a less restrictive method than legal removal, to protect the children.

Mother reluctantly agreed to participate in the FBSS safety plan, which required Nathan or Mother to leave the home and to avoid contact with each other. Lindner said that their separation was the only measure short of removing the children from the home to guarantee there would be no domestic violence in the home.

Mother said that she did not agree with the need for the plan because CPS's idea of "looking after [her] children w[as] to break up a happy home." Mother admitted that she understood the safety plan requirements and that she violated them even though she knew that failure to comply with the safety plan could result in further CPS intervention or the removal of the children. She complained that it was very difficult to manage the plan with only one vehicle. Nathan agreed that they had violated the safety plan and that he did not believe "that a family should be separated in order to solve problems."

On May 4, 2010, Nathan choked Mother or attempted to choke her at their home by putting his hands on her throat while he held N.C.P. II; Mother denied

that Nathan also pushed her to the ground. Mother was around three months' pregnant with A.N.P. at the time and said that D.R.T. Jr. and L.B.T. were inside the house when the incident occurred. Nathan said that he had not choked Mother to the point that she could not breathe and that he thought D.R.T. Jr. and L.B.T. were outside the house at the time while he, Mother, and N.C.P. II were inside.

The next day, Mother agreed to a second safety plan, placing the children with Drake and Tamara. Tamara said that when CPS placed the children with her and Drake, they were told to supervise any visits. She said that they arranged one visit, but it was only supposed to be with Mother, and when they found out that Mother was going to bring Nathan, they cancelled the visit. Tamara said that they cancelled the visit because of Nathan's temper and violence, because they did not think it was okay for the children to be around him, and because they knew that Mother and Nathan were not supposed to be together per the safety plan and CPS's instructions. Tamara said that the same day they cancelled the visit, Mother and Nathan showed up with the police to retrieve the children.

After CPS removed the children from Mother for violating the second safety plan and placed them back with Drake and Tamara, Mother, still pregnant with A.N.P., was hospitalized after taking six to twelve Benadryl, but she denied that she had attempted to commit suicide. Mother said that she did not recall exactly what she told healthcare workers, but she admitted allegations that her

"current husband" was abusive, pushed and hit her, pulled her by her hair, shoved her to the ground, and frequently called her a bitch "sound[ed] like some of the things that [she] expressed to them." Mother said that she admitted to attempting suicide only because her other option was to go to jail. She received a prescription for Zoloft, which she did not fill. Mother said she had received prescriptions for Zoloft before and that Nathan threw her Zoloft away at her request.

On May 10, 2010, six days after the choking incident, Mother and Nathan had an FBSS couple's counseling session with Norma Cruson. Cruson testified that both parents had trust issues and appeared angry with each other. Mother claimed that sometimes she did not know where Nathan was and could not find him. Nathan complained that he felt like Mother was stalking him, and he complained about Mother's drinking alcohol while pregnant and talking negatively to the children. Mother admitted that she had a "potty mouth" and that she "pick[ed]" at the children, saying things like "[p]ick up your shit." To Cruson, Mother appeared to be more focused on Nathan than on the children. Both parents denied having alcohol or substance abuse problems, they cancelled their next appointment without rescheduling, and they were terminated from the couple's counseling program.

Around May 14, Mother and Nathan went to Drake's house and retrieved the children in violation of the safety plan, moved out of the house they had been

living in, and stayed in Nathan's parents' house for several weeks while his parents were out of town. Mother married Nathan on May 15.

In early June 2010, Mother, Nathan, and the children spent three weeks at the Budget Suites in The Colony before Denton County CPS found them. Mother and Nathan had made no significant progress in participating in their FBSS services, and Mother and Nathan refused to place the children back with Drake,[10] so DFPS removed the children and placed them in foster care. DFPS filed its original petition with regard to D.R.T. Jr., L.B.T., and N.C.P. II on June 24, 2010.

On July 6, 2010, not long after the children were removed, The Colony Police Officer Kyle Koiner responded to a disturbance-in-progress call at the Budget Suites and made contact with Mother. Officer Koiner said that when Mother met him at the door of the hotel room, she was "kind of hysterical, crying." Mother told him that she was having pregnancy complications and wanted to go to a hospital, and she pointed to the room where Nathan was and said, "He hit me; I want him out of here." Mother also told Officer Koiner that Nathan had grabbed her wrist, had thrown her to the pavement, and had dragged her back to the room, causing her to strike the back of her head, and Nathan told him that Mother had been trying to leave, that he did not want her to go anywhere, and that "[s]he doesn't go anywhere without [him]." Officer Koiner said that witness accounts matched Mother's story.

---

[10]The FBSS worker's contact notes indicate that Mother told the worker that she did not want to place the children with people that did not like Nathan.

The Colony Police Officer Sophie Gracia responded to the call just after Officer Koiner arrived. While Officer Koiner interviewed Nathan, Officer Gracia met with Mother. Mother told Officer Gracia that she awoke that morning around 6:30 a.m. to find that she was leaking fluid. She called her doctor, who told her that she needed to go to the emergency room. Nathan told Mother that he could not take her to the hospital because there was no gas in the car. When she tried to take the car anyway, he grabbed her left wrist, threw her down on the parking lot cement, and began dragging her into their hotel room. Mother told Officer Gracia that she hit her head several times as Nathan dragged her. Mother also told Officer Gracia that she thought Nathan was on methamphetamine.

Officer Gracia took Mother's written statement, which the trial court admitted as Petitioner's Exhibit 13 and allowed it to be published to the jury. In her statement, Mother set out the following:

> I woke up this morning feeling odd because fluid kept gushing but was not urine. I'm . . . 6 months pregnant [and] called the doctor who said for me to go to the ER to be checked. I told [Nathan], husband, and he said we have no gas. This was at 6:30 a.m. [and] I waited for [Nathan] to wake up to go. When he woke up he was in a pissy mood [and] pushed me out of the bedroom. I went outside to leave, take myself to the hospital [and] he came out[,] grabbed me[,] [and] drug [sic] me inside the room. I told him to let me go and he knocked me to the ground. I was holding onto the door to try to stay out of the room but he dragged me inside. He pushed me real hard on the ground [and] I hit my head against the couch [and] floor. I cut my hand struggling [with] him at the door. We were talking [and] he told me that he wished the baby inside of me would die [be]cause he doesn't care [and] that's when the cops approached. My hand, arm, [and] neck are sore feeling.

14

At trial, Mother denied that Nathan threw her to the pavement or dragged her back into the hotel room or that she fell or was pushed and struck the back of her head. She acknowledged that Nathan had pulled the phone jack out of the wall when she tried to call her doctor.

Officer Gracia gave Mother more victim's assistance information and explained to Mother about protective orders, but Mother refused to file for one, telling Officer Gracia that she did not feel like there was going to be further violence. Contact notes by an FBSS worker indicate that Mother described the incident to the worker and told the worker that the incident proved that she could handle Nathan when he became violent, that she would stay with Nathan when he got out of jail, and that she planned to talk to the judge and tell him that she did not think that jail worked for Nathan and that he needed rehab.

Nathan was arrested for the July 6 incident, and Mother visited him while he was incarcerated. Nathan's parents paid Nathan's bond, and Mother signed an affidavit of nonprosecution on the assault-family violence charge against him. At his October 2010 trial for assault-family violence, Nathan pleaded nolo contendere and received a sentence of 180 days' confinement.

Mother returned to her mother Jane's house after Nathan's July arrest. After CPS conducted home studies, D.R.T. Jr. and L.B.T. were placed with David, and N.C.P. II was returned to Drake and Tamara. On July 28, the trial court set out in its temporary orders the CPS services that Mother was required

to complete, which are discussed below, including counseling and parenting classes.

Mother had a black eye in August 2010 but attributed it to Nathan accidentally elbowing her when they were putting groceries into a refrigerator at an extended-stay hotel, claiming that she stood up too quickly while he was putting items in the freezer.[11]  Denton County CPS caseworker Kellie Parks said that this story was not consistent with the black eye that she saw.

Barnedra Wesley, a parent trainer, testified that she met with Mother and Nathan on August 24 for a two-hour parent training session at their extended-stay hotel in Fort Worth.  Nathan told her that he was raised more "old school" than Mother in terms of discipline and that he felt that Mother was trying to make the children "soft."  Mother expressed to Wesley that she was concerned about Nathan's form of discipline and that she felt that Nathan was a little hard on D.R.T. Jr.  Although they set up a meeting for the following week, Mother and Nathan did not appear for the session, and Wesley learned from the hotel clerk that they had moved a couple of days before.

Gail Spagnola, a psychotherapist and licensed clinical social worker, testified that she met with Mother and Nathan individually starting in August 2010.  Spagnola and Nathan had five sessions before he was incarcerated in

---

[11]Mother subsequently contradicted herself, stating, "I went to put groceries in the freezer.  [Nathan] was kind of down in the refrigerator part.  We didn't coordinate our movements, and his elbow met my eye."

October. When he was released in January 2011, Nathan did not contact Spagnola to set up any additional counseling sessions.

Spagnola said that Nathan told her that his and Mother's relationship had declined significantly over the last six months, that they had been having lots of problems, that they had had a considerable amount of domestic violence, and that most of their domestic violence involved alcohol and frequently occurred in front of relatives. Nathan acknowledged to Spagnola that he had a family history of alcoholism and that he might be an alcoholic.

Spagnola said that Nathan had difficulty managing his anger and that she had witnessed Nathan's face and neck turn red and his jaw muscles clench.[12] Nathan told Spagnola that if Mother had kept her mouth shut, the police never would have become involved and there never would have been a CPS case.

Spagnola and Mother had twelve counseling sessions from August 2010 until January 2011. Spagnola said that Mother's plan from the beginning was to stay with Nathan and try to get the children back but as "things continued to deteriorate between them and [Nathan] ended up going to jail, it became relatively clear that that . . . was not a good, viable plan for that family." Mother claimed responsibility for some of the violence between her and Nathan and said that when they drank alcohol, they would start arguing, which would escalate to

---

[12]Spagnola said that the first time she saw this was in their first session, when Nathan talked about how the court-appointed special advocate (CASA) worker and CPS did not like him and did not want him to be successful and have the children back.

17

physical violence. Mother also acknowledged that Nathan had road rage and a very bad temper that she had seen numerous times, although she said that it had not been directed at her. Mother expressed to Spagnola that she wanted Nathan to stop bullying, beating, and abusing her and, at times, she expressed insight into how the domestic violence between them affected her children, but she also told Spagnola that she was going to divorce Nathan and then see what sort of progress he made before she decided whether to stay around him.

Mother acknowledged to Spagnola that she might have to make a choice between Nathan and her children and said that, if it came to that, she would choose her children, but then she stopped regularly attending her counseling. Spagnola saw Mother twice in November, once in December, and once more in January, two days after Nathan was released from jail. Mother was discharged from her counseling sessions for nonattendance. Spagnola remained concerned about Mother's ability to protect the children if they were returned to her.

Spagnola testified that domestic violence in the home can make children very anxious that a parent may be killed or badly hurt, that the children may try to intervene to protect the parent—risking injury—and that anxiety can distract the children, making it difficult for them to learn; it may also cause them to become depressed. Spagnola said that hearing the violence instead of seeing it still placed the children at risk, with the same outcome.

Edith Finley, another parent trainer, testified that she met with Mother while Nathan was in jail. They had four sessions in October 2010 and three in

18

November 2010. Mother acknowledged the domestic violence to Finley, but Finley said that Mother appeared to be in denial about the effect of family violence on her children, that she seemed to be very protective of Nathan, and that Mother described the violence as "mutual combat." Finley said that of their seven sessions, Mother focused on Nathan for four or five of them, but she also said that Mother appeared to be making progress. Mother acknowledged to Finley that her number one stressor in her life was her relationship with Nathan.

In early December 2010, Finley had to take a leave of absence but made arrangements for Mother to have another service provider. The new provider made several attempts between January 11 and February 25, 2011, to contact Mother and schedule appointments but was only successful in scheduling one class with Mother. Mother did not complete sufficient credits to complete the parenting class requirement.

A.N.P. was born on November 2, 2010.[13] Parks, Mother's Denton County CPS caseworker, testified that CPS did not remove A.N.P. from Mother at that time because Nathan was in jail and presented no immediate risk to the child. Between November and December 2010, Mother moved back and forth between her mother's house and Jason's house.

---

[13]Nathan, who relinquished his parental rights in September 2010 to his six-year-old child with another woman, was incarcerated when all three of his children were born.

19

At the December 9, 2010 permanency hearing, Mother testified that she planned to file for a divorce from Nathan, stating that she was motivated to do so to get "a better life for me and my children, not with violence." However, when asked whether she and Nathan might reunite at some point, Mother said that she did not know and that Nathan had to make changes in his life. Nathan told Cheri Fry, the CASA worker, that the divorce was not real, that Mother could not live without him, and that he could not live without her.

**E. Events during 2011**

In January 2011, Mother's CPS caseworker and a CPS investigator saw Mother's father Tom remove a large bag of beer cans from Jason's house, where Mother and A.N.P. were living. They also saw two glass pipes, identified as drug paraphernalia, on the coffee table. Parks said that resting on the floor, approximately two feet from where Mother was holding A.N.P., was a tin lid containing rolling papers and a green leafy substance that appeared to be marijuana. Mother said that the pipes were not hers and that no one smoked anything around the baby.

Parks said that CPS learned in February 2011 that Mother was allowing Nathan to stay with her at Jane's house. Parks said that Mother attempted to protect Nathan by lying for him to CPS[14] and that this concerned her because it

---

[14]Parks said that during a visit with the children at the beginning of the case, Mother told her that Nathan was not available to attend the visit because he had to work. Parks learned that Nathan had been to the visit, became upset with Mother, grabbed a book out of her hand that was for the children, and then

showed that Mother was willing to protect Nathan and not her children. Shawna Lewis, Mother's Tarrant County CPS caseworker, testified that CPS removed A.N.P. and placed him with N.C.P. II at Drake's house because of the environment Mother and Nathan were exposing him to. Mother explained that CPS did not like the environments at Jane's and Jason's houses "because of reported drug use."

In March 2011, Mother was arrested when her probation on her theft by check offense was revoked for failure to report. While she was in the Tarrant County Jail, Mother received medical treatment for her foot, which Nathan had shut in the car door.[15]

Although Nathan returned to jail in March 2011 for failing to pay his court fees, he had been out for two or three weeks by the time Mother came to court with a black eye on March 31. Mother and Nathan attributed the March 2011 black eye to a picture frame falling on Mother. Parks said that this story was not consistent with how swollen the side of Mother's face was. Parks also saw a bruise on Mother's neck at the end of March or beginning of April. Although

---

took off and returned several times. In March 2011, Parks asked Mother where Nathan was, and Mother said that she thought he was at a friend's house when he had in fact been incarcerated again.

[15]Mother testified that as Nathan squeezed between a PT Cruiser and their vehicle, he pushed the door she had opened and did not see her foot there, and her foot "got a little squished."

Mother testified that Nathan gave her two hickeys right next to each other, Parks said that the bruise was "way too large" to fit Mother's story.

Fry said that at different times when Nathan was not incarcerated, she saw Mother with black eyes and scratch marks, and Mother admitted that she never had black eyes when Nathan was incarcerated. Drake said that Mother would defend Nathan, saying that it was her fault when they argued and fought and that before CPS removed the children, he had seen bruises on Mother's hands and arms. When Fry spoke with Mother about how she could ensure the children had a safe environment, Mother told her that the violence was not going to happen anymore because Nathan had had to go to jail for it.

Mother said that although she and Nathan argued in front of the children, they had not physically fought in front of them except for the choking incident involving N.C.P. II, and she denied that the children would hide when she and Nathan would fight because they were scared. However, according to the therapy notes from D.R.T. Jr.'s counselor, admitted as Petitioner's Exhibit 11, D.R.T. Jr. told his counselor that he had seen Nathan hit his mother, that this made him sad, and that Nathan would spank him with a belt when he had been bad. David testified that he had noticed a change in D.R.T. Jr. and L.B.T. since they came to live with him in July 2010, stating that the boys were no longer scared and had stopped hiding in their room, "a complete one-eighty from when [he] got them."

22

Nathan testified that he and Mother had changed to eliminate the domestic violence between them, stating, "For one, we quit drinking. We quit stressing about the small things. We learned to communicate like we did when we first met. And things have been going a lot smoother. We are a lot more happy [sic] than we were 15 months ago." Nathan said that the last time he had had any alcohol was after he was released from jail in January or February 2011, went to Jane's house, and "got belligerently drunk" with Carl. He described "belligerently drunk" as "getting tanked, getting hammered, having a really good time that you don't remember a lot of things." Nathan said that Jane took care of A.N.P. while he and Carl were drinking.

At the May 2011 trial, Mother said that she and Nathan communicated better now, and this would prevent the domestic violence between them. She testified that she would control her temper because she was not "an innocent flower in the situation." Mother admitted that while she had indicated that she had planned to divorce Nathan, she had felt pressured by CPS to do so and had ultimately decided that she wanted to keep her family together "in its entirety," including Nathan.

## F. Service Plan Requirements

Mother's CPS service plan, incorporated into the trial court's July 28, 2010 temporary orders, required completing a psychological evaluation, weekly counseling sessions, parenting classes, a family violence intake, a drug and alcohol assessment and compliance with any recommendations from that

23

assessment; random drug testing; establishing and maintaining safe, stable, and appropriate housing for at least six months; establishing and maintaining suitable employment for at least six months; and refraining from engaging in any and all criminal activities.

Parks, Mother's CPS caseworker, said that she went over the service plan with Mother but that Mother did not complete her services successfully. Mother acknowledged at trial that from the outset of the case, she had known what was expected of her but still had not met the plan's requirements.[16]

Mother's only drug test, in August 2010, was negative. Mother said that although she completed the required drug and alcohol assessment in December 2010, she had not had the opportunity to complete the recommended intensive outpatient treatment because she had no job, no money, and no transportation, and she complained that there were some problems in obtaining her services. Mother said that she and Nathan sold plasma for gas money so that they could attend the visits with the children and their services but that each donation paid only $25, no one could donate more than twice a week, and she could not donate while pregnant.[17]

---

[16]Nathan also received a service plan but did not complete it.

[17]Mother said she smoked five to ten cigarettes a day, depending on her stress level, but she said that if she did not have gas money to get to her visits with the children, then she did not have cigarette money either.

Parks said that CPS tried to schedule Mother's visits to coincide with some of her services because of Mother's transportation concerns. Lewis, the Tarrant County CPS caseworker, testified that since opening the CPS case on A.N.P., she and Parks had worked together so that Mother would not have to participate in duplicate services in her two CPS cases. When Lewis spoke with Mother over the phone in February 2011, she said that she could hear Nathan in the background, telling Mother what to say.

Fry pointed out that Mother and Nathan were not without a vehicle until April 2011 when Mother sold the truck because they could not afford to fix it. Mother had been driving until then, even though her driver's license had been suspended in 2009 for not having insurance, and even though she knew she could be arrested for driving with a suspended license.

Parks stated that Mother had been doing well on her services when Nathan was incarcerated, telling Parks that she did not want her older sons to grow up and abuse their wives and then have to tell their wives that they learned it from their stepfather. But when Nathan was released from incarceration, Mother stopped attending her services.

**1. Parenting Classes and Visits**

Mother acknowledged that she was discharged from her parenting classes and weekly counseling sessions for nonattendance, even though the parenting classes were brought to her. Mother also admitted that she missed around thirteen visits with her children.

25

Fry observed seven or eight visits between Mother and the children, and both she and Parks noted that Mother's interaction with the children changed after A.N.P. was born, as Mother "dote[d] on the baby," while the other children "play[ed] around her." Before A.N.P. was born, Mother sat in a chair at visits, and the children came to her.

Parks testified that Mother was appropriate in the visits with her children except for an incident in which she and her mother asked the children if they were being spanked and made inappropriate comments such as "spanking kills." When Parks asked them to stop making those comments, they did. Parks said that Nathan was very rough with N.C.P. II at the visits. In the first visit, he swung the then-one-year-old child up by his feet and let him hang there and kept grabbing him, getting in his face, and speaking very loudly, scaring the child.

### 2. Employment and Housing

Fry explained that parents need stable employment so that they can provide for themselves and care for their children and that children "need consistency and a place where they know they're going to sleep every night."

Mother said that her unemployment benefits had expired in July or August 2010 and that her request for additional benefits had been denied. She and Nathan had both started jobs making door-to-door demonstrations a week before the May 2011 trial began, and Nathan's parents were helping them pay for a

room at a Budget Suites.[18]  Nathan said that his 2010 income tax refund was for $3,185.65 and that he had no idea where the money went because he was in jail when Mother picked up the check.  Mother admitted that they had received a tax refund of over $3,000 in January 2011 but said that she did not give any of that money to benefit her children; she did not explain what she did with the money.

When asked how she planned to provide for the children if they were returned to her, Mother said "[t]he same way I did in the past, before CPS was in my life."  She stated that Nathan's parents had said that they would assist "in any way that they have to," and that she would continue to look for a better job.  Mother said that she was not sure where they would live, stating that she "would figure something out as far as, you know, a suitable environment for them."  Parks said that Mother had lived in eight or nine different places since July 2010 and that Mother had had five or six phone numbers since the beginning of the case.[19]

---

[18]Nathan said that his parents had been helping them to cover the cost of lodging, food, and gas.  Mother said that Nathan's cumulative employment during the three-and-a-half year period they had been together was two to four months, while Nathan said it was around seven months.  Nathan pointed out that as "a four-time felon with five misdemeanors," it was difficult for him to get a job.

[19]Mother said that after they moved from Jane's house, she and Nathan stayed at Nathan's parents' house in Flower Mound for around six weeks before moving into a Budget Suites in Lewisville during the three weeks before trial.

### 3. Mother's Family and the Children's Best Interest

Mother told Spagnola that her mother Jane was a viable caregiver for her children, and at trial, Mother said that Jane had watched all of her children at different times since D.R.T. Jr. was four and that she believed Jane had the mental stability and physical ability to care for her children.

Drake testified that Jane has multiple personality disorder and uses drugs occasionally for pain. Spagnola testified that Nathan told her that Jane was in a relationship with a violent man, that Jane had nerve problems, and that Jane was on nerve medicines "as a result of her stress and drama." Tamara testified that she would not leave her children with Jane because she was on a lot of medications and has fallen asleep and burned things with her cigarettes. Drake said that Carl, Jane's boyfriend, had a history of incarceration and drug use. Parks testified that Nathan had reported that he had concerns about A.N.P. living at Jane's house because Carl used methamphetamine, but Nathan denied that he had told anyone this.

Mother said that her father Tom had taken care of her children on many occasions and acknowledged that Tom had a criminal history and a history of drug abuse but said that to her knowledge, he had not abused drugs in many years and lacked the means to obtain any type of drug, legal or illegal. Cruson said that when Nathan told her that Tom smoked marijuana, Mother clarified, "[W]ell, it's in the house, but it's not around the children."

Drake said that Tom was "in and out" of jail while he and Mother were growing up, and Mother told Spagnola that Nathan's jail time did not bother her because "she was accustomed to a man spending a great deal of time in prison." Drake would not allow Tom to care for his children because Tom yelled and screamed at the children, talked down to them, and cursed at them.

Mother acknowledged that her brother Jason used marijuana from time to time but said that he did not watch her children while under the influence of drugs. Drake testified that Jason uses marijuana often and that he and Jason did not have a very good relationship because Jason was not willing to "do what's right by his kids."

Mother said that she believed that returning the children to her was in their best interest because she was their mother. She acknowledged that she was not perfect and that it takes more than love to be a good parent, but she stated, "My boys come first, regardless of what anybody may think or feel. Yes, if I've been given an—the absolute will you pick, my kids come. They come first. They are my world."

Parks said that Mother had endangered the children by continuing to participate in domestic violence while the children were present, knowing she could put the children in harm's way, and by allowing inappropriate people—such as Jane, Jason, and Tom—to supervise the children. Parks said that DFPS recommended termination of Nathan's rights to N.C.P. II and of Mother's rights to all three children because neither Mother nor Nathan had done anything to

29

change throughout the case, neither had completed their services, and neither was able to provide the children with a safe environment, and because Mother continued to stay with Nathan and to make excuses for him.

Fry stated that CASA recommended termination of Nathan's parental rights to N.C.P. II and Mother's rights to all three children as in the children's best interest based on the continued risk presented by Nathan and Mother and Nathan's failure to comply with their service plan and to demonstrate their willingness or desire to provide a safe, suitable, permanent home.

## G. DFPS's Plan for the Children

### 1. D.R.T. Jr. and L.B.T.

David said that he and Sheila had been in a relationship for two years and that she lives with him and the children. He said that Sheila loves D.R.T. Jr. and L.B.T. like they were her biological children—Sheila's four children are grown—and that they eat dinner with D.R.T. Jr. and L.B.T. every night. D.R.T. Jr. told his counselor that he trusted Sheila and that she took good care of him and L.B.T.

David said that there was no yelling or screaming and no physical violence when he and Sheila disagreed and that he had never hit a woman. Mother said that David was "an awesome father" and that she had never experienced domestic violence with David.[20]

---

[20]During Mother's cross-examination by Nathan, Mother said that David was a good father but that she did not think he could protect the children because he testified that he did not have a bad childhood with his father and

Fry, the CASA supervisor, testified that CASA had no concerns about David and Sheila and believed that they could provide D.R.T. Jr. and L.B.T. with a safe and stable environment and could meet the children's needs. Parks testified that David was an appropriate placement for D.R.T. Jr. and L.B.T. because for the past nine months, he had shown DFPS that he was able to provide the children with a safe, stable, and loving environment.

David testified that it was in D.R.T. Jr.'s and L.B.T.'s best interest to terminate Mother's parental rights to them because she did not have the qualities of a good parent in staying with Nathan and because if she retained her parental rights, Nathan would remain involved with the children. He described his support network and the children's schedule and said that he had worked for the same employer for four years. David stated that if Mother's parental rights were terminated, he would maintain the relationship between D.R.T. Jr. and L.B.T. and their half-brothers N.C.P. II and A.N.P. and that he gets along with Drake and Tamara. Tamara said that David was an appropriate placement for D.R.T. Jr. and L.B.T. and that she had no concerns about the boys being placed with him.

## 2. N.C.P. II

Tamara and Drake moved into a larger home when N.C.P. II came to live with them. They bought a bunk bed for their two sons so that N.C.P. II could have a toddler bed in the same room, and Tamara and Drake said that they love

---

therefore showed some level of denial. Mother also said that David told her that he wanted to leave Sheila and had referred to Sheila as a "bitch."

31

N.C.P. II and that their two sons love him and treat him like a brother. Tamara and Drake were prepared to adopt N.C.P. II.

Tamara said that they provided a home for A.N.P. and N.C.P. II because they love them and would rather their nephews be with them instead of strangers. She did not believe that it would be in N.C.P. II's best interest to be returned to Mother or Nathan, stating, "[T]hey're not fit parents. They don't have a stable home. They don't have jobs. They don't—as far as I know, they didn't complete the services that they were ordered to complete. So I don't think that they've become better parents since CPS has gotten involved."[21] Tamara said that Mother's continuing to stay with Nathan even though she knows he is abusive has negatively affected N.C.P. II and A.N.P. and said that she did not like Mother because Mother "continues to choose [Nathan] over her children." Tamara said that she had been a medical transcriptionist for eight years, which allowed her to work at home and gave her more child care flexibility. Drake had worked for the same employer for four years.

Drake said that since Nathan had become involved in Mother's life, she had become more concerned about "keeping [Nathan] happy, versus her kids." Drake stated that when he had spoken with Mother on the phone, he had heard Nathan making threats in the background, saying he would break Drake's knees.

---

[21]Mother told Spagnola that Drake was a "'by-the-book' sort of guy who doesn't really break rules and wouldn't allow things to happen that were ordered not to happen, such as contact and unauthorized visits."

Parks said that Drake and Tamara were an appropriate placement for N.C.P. II because they were able to provide a safe, stable, and loving environment and had even moved into a bigger house and acquired a bigger vehicle to accommodate N.C.P. II and A.N.P. CASA agreed with DFPS's plans for Drake and Tamara to adopt N.C.P. II.

## H. Jury Findings and Termination Order

The trial court appointed David as D.R.T. Jr. and L.B.T.'s permanent managing conservator and terminated Nathan's parental rights to N.C.P. II. It terminated Mother's parental rights to D.R.T. Jr., L.B.T., and N.C.P. II after the jury unanimously found that she had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's emotional or physical well-being, and failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children and that termination of her parental rights was in the children's best interest.

## I. Motion for New Trial

Mother filed a "Motion for New Trial, Notice of Accelerated Appeal, and Statement of Points," in which she challenged the sufficiency of the evidence to support the finding that she engaged in conduct or knowingly placed the children

with persons who engaged in conduct that endangered the children's emotional or physical well-being and the best interest finding. Mother's appeal followed.

### III. Sufficiency

Mother complains in her first issue that the evidence was legally insufficient under family code section 161.001(2) to show that termination of her parental rights was in the children's best interest and in her second and third issues that the evidence was both legally and factually insufficient to support the trial court's findings under subsections (D), (E), and (O) of section 161.001(1).

### A. Standard of Review

We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20–21 (Tex. 1985); *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.). In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh'g).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also id.* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573,

574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D), (E), or (O) of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

Along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination. *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

## B. Preservation of Error

In an appeal from a judgment entered after a jury trial, complaints about the legal sufficiency of the evidence must be preserved through one of the following procedural steps in the trial court: a motion for instructed verdict; a

motion for judgment notwithstanding the verdict; an objection to the submission of the question to the jury; a motion to disregard the jury's answer to a vital fact question; or a motion for new trial, and a complaint that the evidence is factually insufficient to support a jury answer must have been raised in a motion for new trial. *See* Tex. R. Civ. P. 324(b)(2)–(3); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992); *In re D.J.J.*, 178 S.W.3d 424, 426–27 (Tex. App.—Fort Worth 2005, no pet.) (concluding that appellant waived legal and factual sufficiency complaints after a jury trial when he did not file a motion for instructed verdict, a motion for JNOV, an objection to the submission of the question to the jury, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial); *In re G.C.*, 66 S.W.3d 517, 527 (Tex. App.—Fort Worth 2002, no pet.) (same).

Mother filed a motion for new trial but complained only about the legal and factual sufficiency of the evidence to support the best interest and endangerment by conduct findings; she did not challenge the sufficiency of the evidence to support the jury's findings and the trial court's judgment on the other section 161.001(1) grounds. Because only one ground under section 161.001(1) is sufficient to support a judgment of termination, and Mother did not challenge the other two section 161.001(1) grounds in her motion for new trial, we overrule her second and third issues.[22]  *See E.M.N.*, 221 S.W.3d at 821.

---

[22]Further, even if we were to reach Mother's preserved endangerment-by-conduct challenge, as set out above, the evidence is both legally and factually

## C. Best Interest

In her first issue, Mother complains that the evidence is legally insufficient to support the jury's best interest finding.

### 1. Standard of Review

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

The following factors, among others, should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; whether the child is fearful of living in or returning to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an

---

sufficient to support this ground. *See In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.) (stating that under 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment was the direct result of the parent's conduct, including acts, omissions, and failures to act); *see also In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at *5 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.) (stating that, as a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being).

appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

> (A) minimally adequate health and nutritional care;
>
> (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;
>
> (C) guidance and supervision consistent with the child's safety;
>
> (D) a safe physical home environment;
>
> (E) protection from repeated exposure to violence even though the violence may not be directed at the child;  and
>
> (F) an understanding of the child's needs and capabilities; and

whether an adequate social support system consisting of an extended family and friends is available to the child.  *See id.* § 263.307(b); *R.R.*, 209 S.W.3d at 116.

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

> (A)    the desires of the child;
>
> (B)    the emotional and physical needs of the child now and in the future;
>
> (C)    the emotional and physical danger to the child now and in the future;
>
> (D)    the parental abilities of the individuals seeking custody;
>
> (E)    the programs available to assist these individuals to promote the best interest of the child;

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* A parent's inability to provide a stable home and to comply with a family service plan can support a finding that termination is in the best interest of the child. *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (stating that mother's failure to participate in or complete aspects of her service plan, to obtain housing, or to find employment supported best interest finding).

## 2. Analysis

Mother contends that DFPS "wholly failed to present any competent evidence of the facts supporting" best interest as a reason to terminate her

parental rights. She points out that the evidence is undisputed that she and Nathan had three documented incidences of family violence but that "[t]hat is simply not enough to sustain the jury verdict and Trial Court's Judgment that it was in the children's best interest that her parental rights be terminated."

The record reflects that Mother failed to complete her CPS service plan. *See id.* She failed to find stable housing and employment during the progression of the case and missed multiple visits with her children. *See id.* And she continuously failed to recognize how she had endangered her children both through the domestic violence within her relationship with Nathan and through exposing her children to Jane, Tom, and Jason. *See* Tex. Fam. Code Ann. § 263.307(b). Mother also failed to demonstrate that she had the parenting abilities to care for the children or a plan to support them if they were returned to her. *See Holley*, 544 S.W.2d at 371–72.

In contrast, the jury could have chosen to believe testimony by David, Drake, Tamara, the CPS workers, and the CASA worker showing that D.R.T. Jr., L.B.T., and N.C.P. II, had stable, healthy homes away from Mother and Nathan and that their caregivers had appropriate and protective plans for the children. Therefore, we hold that the jury could have reasonably formed a firm belief or conviction that termination of Mother's parental rights to D.R.T. Jr., L.B.T., and N.C.P. II was in the children's best interest, and we overrule Mother's first issue.

41

## IV. Conclusion

Having overruled Mother's issues, we affirm the trial court's judgment.

BOB MCCOY
JUSTICE

PANEL:  LIVINSTON, C.J.; DAUPHINOT and MCCOY, JJ.

DELIVERED:  May 24, 2012